# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

ROCHELLE JERMOLOWICZ,

    Plaintiff,

    v.

BALL CORPORATION and
MICHAEL D. COTNER, in his
individual capacity,

    Defendants.

Civil Action No. 2:11-CV-248-JVB

## OPINION AND ORDER

Ball Metal Beverage Container Corporation ("Ball"), sued here as "Ball Corporation," decided to fire Plaintiff, Rochelle Jermolowicz, after discovering she had lied repeatedly and in elaborate detail about an absence from work. Jermolowicz admits the lie, but claims Ball violated her civil rights under 42 U.S.C. § 2000e et seq. ("Title VII") by terminating her because of her sex. She also sues her former subordinate at Ball, Michael Cotner, for allegedly defaming her by reporting that she placed his hands on her breasts during an evening of drinking at a bar with other acquaintances from work. Those are the only two claims in the case. Defendants have moved for summary judgment of both.

Conceding she lacks direct evidence of discrimination, Plaintiff seeks to prove her Title VII case indirectly. As Ball has shown in its motion for summary judgment, she fails, for at least two reasons. First, Jermolowicz's undisputed lie means she was not satisfying Ball's legitimate expectation of honesty concerning her work. Second, she has identified no man who kept a similar job at Ball after getting caught lying. Cotner is her only ostensible comparator, and he is not known to have lied to Ball. The Court therefore grants Defendants' motion for summary

judgment with respect to the Title VII action, leaving only Jermolowicz's state-law defamation claim, over which the Court declines to exercise jurisdiction.

### A. Facts

Jermolowicz worked for Ball, a manufacturer of metal packaging for beverages, from 1992 until 2010. By 2010, she had risen to a middle-management position, Production Supervisor. In that capacity, Jermolowicz supervised eight workers on the bottle-manufacturing line, including Michael Cotner, whose title was "Lead Maintainer." Jermolowicz, in turn, reported to Rick Nydegger, Manager of Plant Production.

A written "Personal Conduct and Discipline" policy communicated Ball's expectations of employees regarding honesty:

> The company has adopted basic standards for personal conduct and discipline. Employees are expected to conduct business with honesty, decency, and regard for other employees, customers, visitors, and company resources.
>
> When employees do not conduct the business of the company according to these high standards, disciplinary action up to and including termination, may be appropriate.

(DE 18-1 at 15.) The policy specifically listed "[d]ishonesty" and "[f]alsifying or refusing to cooperate or give statements when . . . disciplinary actions or any other authorized investigations are being carried out" among the offenses that could result in termination. (*Id.* at 16–17.)

Ball made available to Jermolowicz a company credit card (Jermolowicz Dep., DE 18-3, at 54:19–22), the use of which was regulated by another written policy and procedure. (DE 18-1 at 12–13.) Jermolowicz understood Ball forbade her from using the card for personal charges. (Jermolowicz Dep. 54:19–55:1.) The written company credit-card policy advised all employee cardholders they would "be held accountable for strict compliance with established guidelines" and that noncompliance could result in termination. (DE 18-1 at 12.)

2

On the evening of about March 12 or 13, 2010, Jermolowicz and some of her coworkers, including Cotner, went out for dinner and drinks at The Riverside, a restaurant and bar in Monticello, Indiana. As the evening progressed, Jermolowicz and Cotner became intoxicated. (Jermolowicz Dep. 75:10–13 (describing herself as "very drunk"); Cotner Dep., DE 25-4, at 17:13–15.) A member of the group had recently undergone a double mastectomy, and the talk turned to whether natural breasts differ significantly from artificially enhanced breasts. (Jermolowicz Dep. 75:25–76:14.) By this time, Jermolowicz had consumed "[p]robably a couple" alcoholic drinks. (*Id.* at 77:6–8.) She told Cotner she did not believe the difference between natural and artificially enhanced breasts was great. (*Id.* at 76:15–17.)

There are varying accounts of what happened next. According to Cotner's deposition testimony, Jermolowicz "grabbed [his] wrists, put [his] hands on her chest and said [her breasts] were real and yelled down to the end of the bar to a friend . . . and said [he] should feel [the friend's breasts] because they were fake." (Cotner Dep. 16:14–19.) Jermolowicz denies touching Cotner at all. (Jermolowicz Dep. 77:17–18.)

Early that June, rumors of impropriety during the March evening at The Riverside reached Nydegger, who approached Paula Thoennes, Human Resources Manager, with the information. Thoennes began an investigation during which she recalls Cotner reporting that Jermolowicz placed his hands on her breasts and asked him whether her breasts felt "real" to him. (Thoennes & Nydegger Summ. Investigation, June 2010; DE 25-2; at 1.) Jermolowicz denied this allegation during the investigation (Thoennes Dep., DE 25-1, at 26:6–7), as she does now. Thoennes, however, concluded the allegation was true (*id.* at 25:17–21, 26:12–14), which led her and Nydegger to recommend to another member of management that Ball terminate Jermolowicz's employment. (*Id.* at 30:20–25.) Ball ultimately responded to the incident by administering to

3

Jermolowicz a "Last Chance Agreement for Unacceptable Behavior." (*Id.* at 31:3–4; Jermolowicz Dep. 102:7–12; June 16, 2010, Mem. to Jermolowicz, DE 18-3 at 65.) The last-chance agreement stated the company's conclusion that Jermolowicz had placed the hands of a subordinate on her breasts while at The Riverside. (DE 18-3 at 65.) Ball advised Jermolowicz further:

> Your behavior has damaged your professional Imagine [*sic*]. In addition, unacceptable behavior of this nature affects more than just you, it reflects poorly on us as management and tarnishes Ball's imagine [*sic*] in the community.
>
> Our investigations also confirmed that you were not honest during the investigation. As a result, it has broken our trust in you.
>
> The list below itemizes the issues that require your immediate attention:
>
> - You must work to regain our trust and re-establish the professional Imagine [*sic*] that we require.
>
> - Retraining in the areas of harassment (as it relates to managers / subordinates), EEOC and general managerial best practices. . . .
>
> - Refrain from unacceptable behavior in the future.
>
> Your role in the plant is key to its operation and success. . . . Consult with Paula Thoennes or [Chris Czajkowski] if you have any questions about what is or is not acceptable behavior. Any future conduct that places the company / plant in a negative position will be cause to evaluate your status with the organization. As a reminder, you are an employee at will who's [*sic*] services may be separated at any time by the organization.

(*Id.*) Jermolowicz understood that one of the reasons Ball was subjecting her to a last-chance agreement was Ball's perception that she had been dishonest during the investigation of the incident at The Riverside. (Jermolowicz Dep. 103:16–21.)

The next relevant event in Jermolowicz's history with Ball pertained to her use of her company credit card for personal charges. Shortly after noon on Tuesday, July 13, 2010, the administrative manager of the plant emailed Jermolowicz about recent nonbusiness charges to the card. (Jermolowicz Dep. Ex. 9, DE 18-3 at 64.) The administrative manager reported an

4

outstanding balance of $249.86 and instructed Jermolowicz to pay it "ASAP." (*Id.*) Jermolowicz responded by email about twenty-three hours later that she had sent a check for the charges, but that it had not yet cleared. (*Id.*) Jermolowicz promised that if the check did not clear by that Friday, she would "put a stop on the check" and pay the balance by phone. (*Id.*) She did pay the bill that Friday, but never placed a stop-payment order. (Jermolowicz Dep. 56:18–19.) The check never cleared. (*Id.* at 56:13–15.) Jermolowicz has testified that some entity, presumably her bank or the institution supplying the credit for her credit card, had promised to "watch for" her check. (*Id.* at 56:20.)

Jermolowicz's *undisputedly* dishonest conduct began about one month later. On Friday, August 20, 2010, she completed an overnight shift at 7:30 a.m. and was scheduled to return to work the same day in the evening. (*See id.* at 35:21–36:9.) She called Nydegger at about 4:09 p.m. on the 20th and explained she would not be coming to work because she was sick. (*Id.* at 36:7–9.) Jermolowicz's next shift at work began that Sunday and ended on Monday, August 23, about 7:00 a.m. (*See id.* at 37:25–38:24.) As that shift was ending, Jermolowicz went to see Thoennes. (*Id.* at 38:24–39:1.)

Jermolowicz reported to Thoennes that she had gone to a hospital on the Friday when she missed work. (*Id.* at 39:6–8.) Jermolowicz told Thoennes she received a blood transfusion and testing for parasites. (*Id.* at 39:12–19.) Jermolowicz said the medical staff knew her family and offered to call her father, but she declined the offer because she didn't want to worry him. (*Id.* at 40:2–5.) Jermolowicz had in fact never been to the hospital, and this entire account was a lie. (*Id.* at 39:6–40:13.)

Nydegger emailed Jermolowicz to request documentation of her August 20 absence from work. (*Id.* at 42:16–22.) After that email, but before the whole house of cards fell apart,

5

Jermolowicz told Nydegger she had "forgotten" to bring the documentation. (*Id.* at 43:4–6.) On August 26, Jermolowicz actually visited a hospital (*id.* at 43:25), and lied again to Thoennes that the doctor Jermolowicz saw on August 26 was "appalled with the medical treatment and the tests the [other] doctor [had done] on August 20th." (*Id.* at 44:3–9.) Jermolowicz had added still more detail to the story at some time between August 20 and August 25, when she attributed her illness to a bad egg burrito from a vending machine at work.[1] (*See id.* at 41:13–42:6.) Jermolowicz told Thoennes on August 26 that the doctor Jermolowicz had seen that day was "upset because on August 20th the doctor had not even tested [her] for the parasites involved in the egg contamination." (*Id.* at 44:14–20.)

On August 30, Jermolowicz received a second email from Nydegger requesting documentation for the events of August 20. (*Id.* at 45: 2–6; Jermolowicz Dep. Ex. 2.) Jermolowicz called to say she would miss work due to illness the next day. (Jermolowicz Dep. Ex. 3; Jermolowicz Dep. 45:20–46:14.) On September 1, she returned to work and delivered to Ball a White County Memorial Hospital emergency-room release form, which she had obtained on August 26. (Jermolowicz Dep. 45:16–19, 46:21–23, 47:7–9; Jermolowicz Dep. Ex. 4.)

Jermolowicz had two such forms, one with a sticker bearing a date stamp indicating a visit on August 26, and another without any date stamp. (Jermolowicz Dep. 48:16–24.) According to Jermolowicz, the hospital "usually" affixes a sticker bearing a date stamp to that form, and the form she turned in "probably" bore such a stamp at some earlier time. (*Id.* at 47:23–24, 48:2–3.) Jermolowicz provided Ball the form that had no date stamp so that she could misrepresent that the form originated from a hospital visit on August 20:

---

[1] By an email on August 25, 2010, sent at 7:53 a.m., Thoennes relayed to managers at the plant the report of one "employee becoming violently ill [the previous] week within hours of eating an egg burrito from the vending machine." (DE 18-3 at 55.) Thoennes explained that as a precaution, Ball "had the Treat America driver remove all of the egg products from the vending machines until further notice." (*Id.*)

|   | Q | And so did you conclude that, Well, I'll bring this one in and tell them it was the one from the 20th because it doesn't have a date on it? |
|---|---|---|
|   | A | I guess I probably did. |
|   | Q | Well, I don't want to know what you probably did. You're under oath. |
|   | A | Yes, I did. |

(*Id.* at 49: 22–50:3.) This particular misrepresentation to Nydegger occurred on September 1. (*Id.* at 50:4–12.) When Nydegger and Thoennes questioned Jermolowicz that day about the lack of a date sticker on the form, Jermolowicz said she had "no idea" what had happened to the sticker. (*Id.* at 50:19–23.) Nydegger and Thoennes instructed Jermolowicz to obtain from the hospital the next day documentation to validate the supposed August 20 visit. (*Id.* at 50:24–51:3.)

On September 2, Jermolowicz submitted two doctor slips to Ball, one pertaining to a request for medical leave under the Family and Medical Leave Act ("FMLA") and the other from an August 31 doctor visit. (*Id.* at 51:11–25.) Jermolowicz admitted during her September 2 meeting with Thoennes for the first time that she had no document to validate her August 20 absence. (*Id.* at 52:1–7.) Thoennes told Jermolowicz to go back to the hospital to obtain the documentation, and Jermolowicz then admitted that the supposed August 20 hospital visit was a lie. (*Id.* at 52:8–12.) Jermolowicz agrees Thoennes then had "good reason" to have reservations about Jermolowicz's integrity, albeit only "[f]or that incident." (*Id.* at 53:12–18.) Thoennes advised Jermolowicz at the end of the September 2 meeting that she and Nydegger would "be back in touch" regarding Jermolowicz's integrity issue. (*Id.* at 59:15–19.)

In accordance with Jermolowicz's request, she began a period of FMLA leave after the September 2 meeting. (*Id.* at 60:1–3.) It lasted twenty-five days, until her next meeting with Thoennes and Nydegger, when Jermolowicz received the news she was fired. (*Id.* at 60:4–8.) Thoennes explained during the September 27, 2010, meeting that Jermolowicz had irreparably

7

broken Ball's trust and that Ball was terminating her employment because of her dishonesty. (*Id.* at 104:16–22.)

**B. Law**

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing each cause of action determines materiality. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a dispute of fact is "genuine" depends on whether the evidence would permit a reasonable verdict in favor of the nonmoving party. *Id.* Courts considering summary judgment must view the evidence "in the light most favorable to the party opposing the motion," *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003), which means drawing all reasonable inferences against summary judgment. *See Liberty Lobby*, 477 U.S. at 242.

Because Plaintiff has no direct evidence of discrimination (Resp. Mot. Summ. J., DE 25, at 10 n.2), the prima facie requirements of the indirect method of proof supply the material facts for her claim of sex discrimination in violation of Title VII. *See Liberty Lobby*, 477 U.S. at 248; *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) ("In a disparate treatment case such as this one, a plaintiff may prove discrimination either directly or indirectly."). "Under the indirect method, the plaintiff carries 'the initial burden under the statute of establishing a prima facie case of . . . discrimination.'" *Coleman*, 667 F.3d at 845 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). This means the plaintiff needs evidence that: (1) she is a member of a protected class, (2) her performance met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated a similarly situated individual

outside of the protected class more favorably than her. *Id.* (quoting *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006)).

Where all federal claims are disposed of before trial, it is usually, though not always, appropriate for a federal court to decline to exercise jurisdiction over any remaining pendent state-law claim. *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). The decision is driven by considering the factors of "judicial economy, convenience, fairness and comity." *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also* 28 U.S.C. § 1367. The Seventh Circuit has identified three "unusual" circumstances where the balance of the factors "will point to federal decision of the state-law claims on the merits." *Wright*, 29 F.3d at 1251–52. The first such circumstance "may arise when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251 (citing *Duckworth v. Franzen*, 780 F.2d 645, 656 (7th Cir. 1985); *O'Brien v. Cont'l Ill. Nat'l Bank & Trust*, 593 F.2d 54, 65 (7th Cir. 1979)). The second "occurs when 'substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort.'" *Id.* (quoting *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347–48 (7th Cir. 1986)). The third such circumstance is present "when it is absolutely clear how the pendent claims can be decided." *Id.*

### C. ANALYSIS

Ball's opening brief in support of its motion for summary judgment argues an employee who lies repeatedly and in elaborate detail about the reason for her absence from work is not meeting her employer's legitimate expectations where the employer has a written policy in place requiring honesty of its employees. The Court agrees. In *Coco v. Elmwood Care, Inc.*, 128 F.3d

9

1177, 1179 (7th Cir. 1997), the United States Court of Appeals for the Seventh Circuit explained an employer's "legitimate expectations" are "simply [his] bona fide expectations, for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers." "In other words, so long as the employer's employment expectations are 'in good faith[,] without fraud or deceit,' we only determine if the employee met them." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000) (alteration in original) (citing Black's Law Dictionary 168 (7th ed.1999)).

It would be absurd to suggest Ball's basic expectation of honesty was itself fraudulent or characterized by deceit, and Plaintiff has not done so. The following two sentences represent the entirety of her ostensible response to Ball's argument that there is no genuine dispute she was not meeting its legitimate expectation of honesty:

> Defendant contends that Plaintiff was not meeting Ball's legitimate employment expectations because she allegedly violated Ball's anti-harassment policy when she allegedly placed the hands of Cotner, her subordinate, on her breasts in a bar; however, Plaintiff has repeatedly denied that such conduct, in fact, took place. Because the Court must view all facts in Plaintiff's favor for purposes of summary judgment, Plaintiff's position is what the Court should accept.

(Resp. Mot. Summ. J. 12.) It's simply a red herring.[2] Jermolowicz has completely ignored Ball's legitimate expectation of honesty concerning her August 20 absence. Moreover, Ball responded to the incident at The Riverside not with termination but with a last-chance agreement, which she has not contended constituted an adverse employment action. (*Id.* (citing termination as the only adverse employment action at issue).)

---

[2] Even inferences that Jermolowicz was innocent of the allegations at The Riverside and that Ball fired her for harassing Cotner would not establish sex discrimination in violation of Title VII. After all, "[a]n employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (citing *Wade v. Lerner N.Y., Inc.*, 243 F.3d 319, 323 (7th Cir. 2001) (employer's honest but mistaken belief that plaintiff had been late for work defeated claim of age discrimination)).

When a plaintiff fails to support a reasonable inference she has met her employer's bona fide expectations, she "is not entitled to present [her] case to the jury and we need not proceed to the remaining steps of the *McDonnell Douglas* framework." *Robin*, 200 F.3d at 1090 (citing *Coco*, 128 F.3d at 1179–80). Thus, Jermolowicz's admitted lie about her absence from work dooms her Title VII case.

It's not the only fatal defect. Jermolowicz has also failed to identify a similar male employee whom Ball did not fire. Cotner is the only potential comparator Jermolowicz has posited. (Resp. Mot. Summ. J. 13.) According to Plaintiff, there are two reasons why Ball's failure to terminate Cotner would enable a jury to infer reasonably that Ball fired her because of her sex:

> First, when Nydegger first heard through the "grapevine" of an alleged incident at The Riverside, he only reported to Paula Thoennes that the alleged incident involved Plaintiff and did not mention Cotner's name at all. Second, after their investigation into the matter, Thoennes testified that she and Nydegger simply believed Cotner over Plaintiff in determining that the alleged conduct did, in fact, take place.

(*Id.*)

To be sure, it is possible Cotner lied to Ball about what happened at The Riverside. Though Ball determined otherwise, it has no way of knowing for sure. The point remains, however, that Jermolowicz did two things Cotner never did. She misused her company credit card and then told a *confirmed* elaborate lie to explain an absence from work. As a result, Jermolowicz and Cotner are not comparable in all material respects, as required by the Seventh Circuit. *See Coleman*, 667 F.3d at 846.

What about Plaintiff's claim for defamation per se under Indiana law? The Court would not have jurisdiction over this claim, standing alone, on the basis of diversity or a federal question. (*See* Am. Compl., DE 4, at 2 (citing only supplemental jurisdiction under 28 U.S.C. § 1367 as a basis for the Court's authority over the defamation action); Ans., DE 12, at 3 (supplying no other

source of jurisdiction over the defamation claim).) The Court thus confronts the question whether to exercise jurisdiction as a matter of discretion. *See Wright*, 29 F.3d at 1251–52 (discussing this decision in depth).

The Court declines. "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Id.* at 1251 (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). Of the three recognized exceptions to this general rule, *see id.* at 1251–52, none is present.

First, the passage of time during the pendency of this action in federal court will not cause Jermolowicz to lose her right to recover on her allegations of defamation. The Indiana Court of Appeals has held:

> [W]hen in good faith a plaintiff brings an action in federal court within the statute of limitations, but it fails for lack of diversity jurisdiction, the statute of limitations is tolled with the filing of the suit for purposes of determining whether a subsequent state action involving the same parties and the same claims is brought within the statute of limitations.

*Torres v. Parkview Foods*, 468 N.E.2d 580, 583 (Ind. Ct. App. 1984). *See also* Ind. Code § 34-11-8-1 (the Journey's Account Statute); *Vesolowski v. Repay*, 520 N.E.2d 433, 434 (Ind. 1988) (explaining the "broad and liberal purpose" of the Journey's Account Statute, to ensure diligent plaintiffs retain the right to a hearing in court until a judgment on the merits is reached, is "not to be frittered away by narrow construction").

Exercising jurisdiction over the defamation claim would not conserve substantial judicial resources, either, because the Court has not invested significant time in dealing with it. *See Wright*, 29 F.3d at 1251 (discussing this second exception). Nor is it "absolutely clear how the pendent claim can be decided;" this Court has not already decided an issue dispositive of the defamation claim. *See id.* (third and final exception).

## D. Conclusion

The Court—

- **GRANTS** Defendants' motion for summary judgment (DE 16) as to Count 1 of the Amended Complaint, Plaintiff's Title VII claim;

- **DENIES** the motion for summary judgment as to Count 2, Plaintiff's claim for defamation per se under Indiana law;

- **DISMISSES** Count 2 **WITHOUT PREJUDICE**; and

- **VACATES** the trial and final pretrial conference dates.

**SO ORDERED** on May 30, 2013.

                                             s/ Joseph S. Van Bokkelen
                                             JOSEPH S. VAN BOKKELEN
                                             UNITED STATES DISTRICT JUDGE